UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

CONSERVATION NORTHWEST, a
Washington non-profit corporation,
and CASCADIA WILDLANDS PROJECT, an
Oregon non-profit corporation,

       Plaintiffs,

       v.

The UNITED STATES FOREST SERVICE,
an agency of the United States
Department of Agriculture,

       Defendant,

       and

BOISE BUILDING SOLUTIONS
MANUFACTURING L.L.C., a Delaware
limited liability company,

       Defendant-Intervenor.

NO. CV-05-0220-EFS

**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION AND CONTINUING
INJUNCTION FOR ONE WEEK**

On August 25, 2005, the Court heard oral argument on Plaintiffs
Conservation Northwest and Cascadia Wildlands Project's Motion for
Preliminary Injunction, (Ct. Rec. 3).  Ms. Karen S. Lindholdt appeared
on behalf of Plaintiffs Conservation Northwest and Cascadia Wildlands
Project ("Plaintiffs"), while Ms. Julia Jones represented Defendant
United States Forest Service ("USFS") and Mr. Shay Scott represented
Defendant-Intervenor Boise Building Solutions Manufacturing L.L.C.

ORDER ~ 1

("Boise"). After reviewing the submitted material, taking oral argument, and considering relevant authority, the Court is fully informed and hereby **denies** Plaintiffs' Preliminary Injunction Motion, (Ct. Rec. 3).

## I. Background

In August 2004, the Fischer Fire burned approximately 16,513 acres of woodlands within the Wenatchee River Watershed. The Fischer Fire Project ("FFP") – instituted in response to this large wildfire – area consists of the 10,873 acres of burned woodland located in the Okanogan and Wenatchee National Forests as well as two small helicopter landing areas outside the fire perimeter. EA at 1-3. The remainder of the burned land includes 300 acres on other federal land, 1,074 acres of Washington State Department of Natural Resources land, and 4,287 acres of private land. *Id*. Within the FFP, 1,037 acres are allocated as Managed Late Successional Area ("MLSA"). EA at 1-4. These areas were identified to protect and enhance conditions of late-successional and old-growth ecosystems, which serve as habitat for late-successional and old-growth species, such as the northern spotted owl. EA at 1-23. While the northern spotted owl no longer resides in the MLSA allocation, there is one historic activity center in the Eagle MLSA outside the project area that has been unoccupied since 1997. *Id*. The remainder of the FFP area, 9,836 acres, is comprised of Matrix land. EA at 1-4. Matrix land represents the area traditionally used for timber harvest and silvicultural activities. EA at 1-6.

In March 2005, the USFS submitted their final EA for the FFP. On March 29, 2005, James Boynton, Forest Supervisor for the Okanogan-Wenatchee National Forest, signed a Finding of No Significant Impact

Decision Notice ("DN") for the FFP.  The FFP was divided into three salvage sales: the Blag in Black, Cow, and Rollin Rock.  On March 28, 2005, Pacific Northwest Regional Forester, Linda Goodman determined the FFP was an emergency situation and exempted the first two sales from stay pursuant to 36 C.F.R. § 215.10 as the timber value would decrease by $893,804 if not instituted quickly.  DN at 26.  As such, the Blag in Black and Cow salvage sales were awarded on April 18, 2005, and May 11, 2005, respectively.  (Ct. Rec. 20 ¶ 7-8.)  Mr. Boynton did not include the Rollin Rock salvage sale ("RRSS"), into the emergency situation request because it contained a higher percentage of Douglas fir trees, less susceptible to quick deterioration and, thereby, less susceptible a loss of value.  (Ct. Rec. 31-4 ¶ 7.)  The RRSS also contained all of the Eagle MLSA land allocations of this FFP, creating greater need for public commentary.  *Id.*  Since the RRSS was not included in the emergency situation request, it was not advertised until June 18, 2005.  On July 14, 2005, the RRSS contract was purchased by Boise Building Solutions Manufacturing, L.L.C. ("Boise").  (Ct. Rec. 20 ¶ 12, 14.)  The RRSS was scheduled to begin on July 27, 2005.  *Id.* ¶ 6.

Mr. Boynton certified in the DN no significant impacts would occur as a result of the FFP, and thereby, the USFS did not have to prepare an Environmental Impact Statement ("EIS").  In response, Plaintiffs filed their Temporary Restraining Order and PI motion for the RRSS on July 22, 2005, (Ct. Rec. 3).  Plaintiffs assert six claims for relief: (1) the USFS failed to prepare an EIS for the FFP in violation of the National Environmental Policy Act ("NEPA"), (2) the USFS failed to disclose and analyze the environmental impacts of the FFP in violation of NEPA, (3)

the USFS did not consider a reasonable range of alternatives in violation of NEPA, (4) the USFS's snag removal authorization in the MLSA violates the National Forest Management Act ("NFMA"), (5) salvage within the Eagle MSLA for the purpose of economic recovery violates NFMA, and (6) the USFS did not comply with the soil standards and guidelines of the Wenatchee Land Resource Management Plan ("WLRMP") in violation of NFMA.  (Ct. Rec. 1 at 13-22.)

## II. Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy.  *Weinberger v. Romero-Barcelo*, 102 S. Ct. 1798, 1803 (1982); *Hawai'i County Green Party v. Clinton*, 980 F.Supp. 1160, 1167 (D. Hawai'i 1997).  In the Ninth Circuit, a court may grant such a remedy if a plaintiff "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor."  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (quoting *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995)).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998) (quoting *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)).  Plaintiff, as the party seeking injunctive relief, bears the burden of demonstrating these factors justifying relief by *clear and convincing evidence*.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441 (1974) (emphasis added).

"Injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995). The Supreme Court has held that insufficient evaluation of environmental impact under NEPA does not create a presumption of irreparable injury. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). However, the Ninth Circuit observed "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (citing *Amoco*, 480 U.S. at 545). Therefore, "when the environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Id.* Irreparable harm is defined as an actual or concrete harm, or the imminent threat of an actual or concrete harm. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). A threat of harm will not be considered "imminent," if it is based on merely remote possibilities or speculation. *Carribean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 675 (9th Cir. 1988).

In reviewing the USFS's compliance with NEPA and NFMA, the court must determine whether the agency's actions were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *Or. Nat. Resources Council v. Loew*, 109 F.3d 521, 526 (9th Cir. 1997). Review under such a standard is narrow and highly deferential, only requiring the agency to "articulate a rational

ORDER ~ 5

connection between the facts found and the conclusions made." *Id*.  The Ninth Circuit requires that a challenge to a decision to not prepare an initial EIS must be reviewed under the arbitrary and capricious standard. *Greenpeace Action*, 14 F.3d at 1331.  Given the narrowness of the standard of review, the Court recognizes it may not substitute its own judgment for that of the agency concerning the wisdom or prudence of a proposed action.  *W. Radio Services Co., Inc. v. Glickman*, 113 F.3d 966, 970 (9th Cir. 1997).

### III. Analysis

**A.  NEPA - EIS Determination**

Plaintiffs assert the USFS violated NEPA by not preparing an EIS. The purpose of NEPA is to foster better decision-making and informed public participation for actions affecting both people and the environment.  42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c).  To that end, NEPA is a procedural, rather than substantive statute; it does not force an agency to choose the most environmentally sound alternative, but it does ensure that agency action is "fully informed and well considered." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).  One of NEPA's procedural requirements is federal agencies are to prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  In order to determine whether a proposed action requires preparation of an EIS, the USFS must conduct an EA of the proposed action.  40 C.F.R. §§ 1501.4, 1508.9.  If the agency determines the effects will not be significant, it must then issue a FONSI.  40 C.F.R. § 1508.13.  "An agency's decision not to prepare an EIS . . . may be

1  overturned only if it was arbitrary, capricious, an abuse of discretion,

2  or otherwise not in accordance with law." *Cold Mountain v. Garber*, 375

3  F.3d 884, 892 (9th Cir. 2004).

4      "An EA need not conform to all the requirements of an EIS."

5  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th

6  Cir. 2003) (quoting *S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*,

7  720 F.2d 1475, 1480 (9th Cir. 1983)).    However, "[n]o matter how

8  thorough, an EA can never substitute for preparation of an EIS, if the

9  proposed action could *significantly* affect the environment." *Anderson*

10 *v. Evans*, 371 F.3d 475, 494 (9th Cir. 2004).    "In determining whether an

11 action will 'significantly' effect the environment, the CEQ regulations

12 provide certain factors should be considered." *Alaska Center for Env't*

13 *v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

14     Plaintiffs assert the FFP will 'significantly' affect the

15 environment under several of the factors discussed in *Alaska Center for*

16 *Env't* and enumerated in 40 C.F.R. § 1508.27(b).    The factors identified

17 by Plaintiffs are: (1) the unique characteristics of the area, (2) the

18 highly controversial effects of the project on the human environment, (3)

19 the unique risks posed by the project, and (4) the cumulative impacts of

20 the project.    *Id*.    The remaining factor cited by Plaintiffs – federal law

21 violations of NFMA and NEPA – is discussed generally throughout this

22 order.

23          **1.    Unique Characteristics: MLSA**

24     Plaintiffs contend the USFS has not provided sufficient rational

25 without an EIS as to why the FFP will not adversely effect the Eagle

26 MLSA.    (Ct. Rec. 15-1 at 9.)    They argue the extensive snag removal and

ORDER ~ 7

1  downwood, which characterizes late-successional habitat, will have

2  significant impacts on the MLSA and the habitat it supports.  (Ct. Rec.

3  15-1 at 8.)

4      The Northwest Forest Plan ("NFP") was originally instituted in 1992

5  to effectuate two primary goals: "the need for forest habitat and the

6  need for forest products."  (Ct. Rec. 31-5 at 4.)  This implicates both

7  the long-term health of the forest ecosystems as well as maintaining a

8  sustainable supply of timber for local economies.  *Id*. at 5.  The MLSA

9  allocations were specifically identified in 1994 "for certain owl

10 activity centers . . . where regular and frequent fire is a natural part

11 of the ecosystem.  Certain silvicultural treatments and fire hazard

12 reduction treatments are permitted to help prevent complete stand

13 destruction from large catastrophic events."  NFP at C-23.  Further,

14 salvage guidelines under the NFP "are intended to prevent negative

15 effects on late-successional habitat, while permitting some commercial

16 wood removal."  *Id*. at C-13.  To this expressed end, the EA evaluated the

17 effects of salvage logging in the Eagle MLSA, which will promote

18 reforestation and proper snag densities, and the Court finds the USFS

19 reasonably concluded the methods of salvage would cause no significant

20 impact on the MLSA region.  EA at 3-15.

21      Of the 1037 acres of MLSA allocated land in the FFP area, salvaging

22 will only occur on 350 acres.  EA at 1-4; (Ct. Rec. 31-4 ¶ 4.)  Snag

23 retention levels in the MLSA will follow the guidelines expressed in the

24 NFP, such that a sufficient amount of snags for wildlife habitat will

25 remain until approximately 80 years following salvage and reforestation

26 when new snag recruitment can begin from the green stand.  DN at 10; EA

at 3-90.  To accomplish this goal, the USFS only plans to salvage trees up to 20" in diameter with a 75 percent or higher probability of dying and injured trees larger than 20" in diameter with an 85 percent or higher probability of dying.  DN at 10.  Further, all trees larger than 36" in diameter will be retained.  *Id*.  The FFP also proposes to harvest in high fire intensity areas where current snag levels far exceed management goals for the Eagle MLSA due to the extreme effects of the fire.  EA at 3-91.  No trees will be salvaged in suitable spotted owl habitat, of central importance to the NFP.  *Id*. at 3-85.  Neither will harvest occur in 42 percent of the burned portion of the Eagle MLSA.  *Id*. at 3-90.

Through this plan, the USFS has articulated a sufficient rational connection between the facts found and the conclusion that no significant impact will occur in the Eagle MLSA, which is all that is required under Ninth Circuit review.  *See Loew*, 109 F.3d at 526.  Further, the Court is mindful that once the USFS "makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference."  *Alaska Ctr. for Env't*, 189 F.3d at 859.  As such, the Court is likely to ultimately find the USFS's decision to not prepare an EIS is neither arbitrary nor capricious nor does it express a clear error of judgment.  *Id*.

### b.  Controversial Effects and Unique Risks

Plaintiffs also argue preparation of an EIS is required since the impacts of the project are characterized by scientific controversy and pose unique risks to the environment.  (Ct. Rec. 15-1 at 9.)  Scientific controversy, in the context of NEPA disputes, refers to a "substantial

dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). Plaintiffs' three central claims regarding scientific controversy argument are the USFS's: (1) inappropriate reliance on DecAID, (2) misuse of the WEPP model, and (3) apparent disregard for the *Beschta* report. (Ct. Rec. 15-1 at 9-11.)

DecAID stands for 'decayed wood advisor' and is an advisory tool developed to help wildlife managers evaluate the effects of forest conditions on wildlife that use snags and downwood. EA at 3-91. Within their memorandum, Plaintiffs claim DecAID's authors stated DecAID "does not specifically address effects of fire." (Ct. Rec. 15-1 at 10.) Plaintiffs argue the USFS improperly relies on DecAID to "model snag retention levels within harvest units" for post-fire logging. (Ct. Rec. 15-1 at 10.) However, the EA claims to only use DecAID as a "comparison tool for wildlife-use data." EA at 3-91-92; (Ct. Rec. 31-6 ¶ 16.) Further, the EA states:

> DecAID also provides decayed wood (snags and logs) inventory data, but this will not be used because fire exclusion in this dry forest environment has led to changes in current levels, composition, and distribution of decayed wood elements, and they may not reflect historic or natural conditions . . . thus, could be misleading and inappropriate.

EA at 3-92. Thus, the Court finds the USFS did not rely on DecAID to provide snag inventory retention numbers for the FFP, but rather followed the MLSA recommendations embodied in the WLRMP, which "were adopted for the entire project area." EA at 3-91.

ORDER ~ 10

WEPP stands for the Water Erosion Prediction Program and was used in water quality and soil erosion analyses. *Id.* at 3-58. Plaintiffs challenge the use of the Disturbed WEPP to model impacts to soils and water quality caused by the FFP. (Ct. Rec. 15-1 at 10.) Contrary to Plaintiffs' position, however, there are technical documents in support of the USFS's use of the Disturbed WEPP to predict runoff and sediment yield from forest fires and harvested forests *See* EA at 3-58 & L-10 (citing to technical documents produced by Elliot, W.J.). Since substantial deference is given to the USFS's decision to resolve scientific disputes as it sees fit, and because scientific evidence supports the USFS's application of the Disturbed Wepp, the Court is not likely to find the USFS's use of the Disturbed Wepp to be improper. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985).

Plaintiffs also allege the USFS ignored the impacts of post-fire salvage logging discussed in the *Beschta* Report. (Ct. Rec. 15-1 at 9-10.) Yet, the EA references the *Beschta* Report's recommendation that natural recovery be instituted following a fire in many different places within the EA. EA at 1-31, 1-32, 2-33, 3-7, 3-9, 3-88. Further, the no-action alternative – discussed in detail along with only three other viable alternatives throughout the EA – embodies this recommendation by proposing no salvage logging or reforestation. EA at 2-4, 2-5. However, since forest fire suppression and ecosystem restoration were not the focus of the EA given its expressed purposes, many issues raised in the *Beschta* Report were not analyzed in the fullest detail in the EA. *Id.* at 1-31, 1-32. NEPA does not require the USFS to "consider every

possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle Audobon Society v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996). Further, where the USFS supports its conclusions with thorough analysis, the court's function is not to referee a dispute between scientists. *See Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife Serv.*, 273 F.2d 1229, 1236 (9th Cir. 2001). The Court finds the USFS went beyond the requirements of *Moseley* by examining the recommendations of the *Beschta* Report as an alternative.

Before the Court is not a "substantial dispute [about] the size, nature, or effect" of the FFP, *Evans*, 371 F.3d at 489, but rather merely Plaintiffs' "opposition to a use." *Id*. This opposition is insufficient to justify entry of a PI. *See Id*. Accordingly, the Court is unlikely to find Plaintiffs' disagreement with the USFS gives rise to an arbitrary conclusion by the USFS that an EIS does not need to be prepared.

### c. Cumulative Impacts

Plaintiffs assert the USFS did not take a hard look at the cumulative impacts of past, present, and future projects on the FFP. In their reply and at oral argument, Plaintiffs supplemented this claim by pointing out the EA failed to sufficiently discuss in detail the scope and timeline of past timber activities in the FFP area, citing to *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Defendant responds by claiming the FFP does not possess the same nexus between prior harvests and the current environmental harm in the area. Further, Defendant-Intervenor contends the Council of Environmental Quality ("CEQ") recently published a guidance regarding cumulative effects

1  analysis that accords with the scope of past analysis done by the USFS

2  here.

3        "Cumulative effects analysis requires the Environmental Impact

4  Statement to analyze the impact of a proposed project in light of that

5  project's interaction with the effects of past, current, and reasonably

6  foreseeable future projects." *Lands Council*, 395 F.3d at 1027;

7  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809-810 (9th

8  Cir. 1999). An EA must assess cumulative impacts. However, the degree

9  of cumulative effects analysis in an EA may be less than that required

10 in an EIS. *See Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 957

11 (9th Cir. 2002). Further, "NEPA imposes [only] procedural requirements

12 designed to force agencies to take a 'hard look' at environmental

13 consequences." *Lands Council*, 395 F.3d at 1027 (quoting *Earth Island

14 Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir.

15 2003)). Thus, in considering a challenge to the USFS's compliance with

16 these procedural requirements, "[t]he role of the courts is simply to

17 ensure that the agency has adequately considered and disclosed the

18 environmental impact of its actions and that its decision is not

19 arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Natural Res. Def.

20 Council, Inc.*, 462 U.S. 87, 97-98 (1983). "[A court] may not substitute

21 [its] judgment for that of the agency concerning the wisdom or prudence

22 of a proposed action." *Laguna Greenbelt, Inc. v. United States Dep't of

23 Transp.*, 42 F.3d 517, 523 (9th Cir. 1994).

24       First, the Court finds Plaintiffs' reliance on *Lands Council* for the

25 proposition that the EA did not sufficiently discuss in detail the scope

26 and timeline of past timber activities in the FFP area misplaced. The

Court accepts the rule in *Lands Council* that an EIS must take a hard look at the cumulative impacts of an action, but the Court finds the facts of *Lands Council* distinguishable because *Lands Council* did not involve a salvage operation following a natural catastrophic event. Rather, it involved a watershed restoration project, which included a component calling for harvesting <u>live</u> trees. *Id*. at 1025. In *Lands Council*, there was a conceded nexus between the past extensive timber logging and the environmental harm facing the area. *Id*. The Ninth Circuit found the EIS's lack of "description of past timber harvests and previous environmental harm caused by these past timber harvests" prevented the public and the USFS from engaging in the required procedural decision-making mandated by NEPA. *Id*. at 1028. Whereas, here, the nexus of prior harvests and environmental harm does not exist. In the present case, the widespread catastrophic fire overshadowed previous timber sales in the area, making previous activities' impacts on the land insignificantly small. The Court finds the holding in *Lands Council* does not apply here given the lack of nexus between the effects of previous activities in this area and the present state of the woodlands within the Wenatchee River watershed. Regardless, the USFS addressed the cumulative impacts of the FFP in the EA.[1]

---

[1]Chapter three of the EA contains a large amount of cumulative impacts analysis for all four major alternatives in the following areas: timber recovery, MLSAs, soils, fuels, water quality, wildlife, proposed endangered, threatened, and sensitive plants, fish, forest stand establishment, range, scenic and landscape character, roadside safety,

ORDER ~ 14

In addition, the Court finds the EA's cumulative analysis compliant with CEQ's recent publication, *Guidance on the Consideration of Past Action in Cumulative Effects Analysis*, (Ct. Rec. 32-2).  CEQ was created by NEPA and is the body responsible for promulgating NEPA's implementing regulations.  42 U.S.C. § 4344; *Jones v. Gordon*, 792 F.2d 821, 827 (9th Cir. 1986).  As a result, CEQ's interpretation of NEPA is entitled to substantial deference.  *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).  Accordingly, the Court finds CEQ's recent June 24, 2005, publication authoritative, especially given that it is the most  recent discussion of cumulative effects analysis.[2]  The CEQ explained agencies should use scoping to identify "what information is necessary for a cumulative effects analysis" and focus on information "'essential to a reasoned choice among alternatives.'" *Id.* at 1 (quoting 40 C.F.R. § 1502.22(a)).  "Agencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effects of all past actions combined," and the agency's decision is entitled to substantial discretion as to the extent of the inquiry required.  *Id.* at 2 (citing *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 377-77 (1989)).  An adequate analysis focuses "on the current aggregate effects of past actions without delving into the historical details of individual past actions." *Id.*  Agencies may limit the scope of such analysis "based on practical considerations."  *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).  EAs finalized

and recreation.

[2] *Lands Council* was amended and superseded on January 24, 2005, 395 F.3d 1019 (9th Cir. 2005).

ORDER ~ 15

1  with a Finding of No Significant Impact "usually involve only a limited

2  cumulative impact assessment to confirm" the effects are insignificant.

3  *Id*. at 3.  Under these requirements, the Court finds the USFS took the

4  necessary 'hard look' at previous environmental impacts.

5      Plaintiffs also assert the USFS failed to consider cumulative

6  impacts associated with the "reasonably foreseeable future" activity of

7  fire suppression in the watershed.  (Ct. Rec. 15-1 at 12.)  However, the

8  EA does extend discussion to the effects of the fire suppression

9  activities related to the Fischer Fire, including the creation of fire

10 lines, the paths of fire fighting and support vehicles, the designation

11 of safety zones, rehabilitation efforts, and other issues.  EA at 2-36.

12 Further, the Fuel Loading section of Chapter three of the EA gives an

13 analysis of the increased/decreased fire risks associated with the

14 proposed alternative.  *Id*. at 3-52.  The section assesses the increased

15 fire risks associated "with the availability of the larger CWD (*i.e.*

16 fallen snags) left on site as it decays to receptive fuels and intermixes

17 with the fine fuels produced 10-40 years out.  Prescribed fire or

18 mechanical treatment during a future period could ameliorate the high

19 fire severity effects possible."  *Id*.  The EA also analyzes the effects

20 of other future events, such as private land salvage logging and the

21 proposed Eagle Forest Health Project.  *Id*. at 2-38.  Without the Eagle

22 Forest Health Project, the EA notes a potential environmental threat of

23 bark beetle infestation could occur.  *Id*.

24      In summary, given the existence of a widespread catastrophic event

25 weakening the nexus between past timber activities and the current

26 environmental harm, combined with the USFS's compliance with CEQ

ORDER ~ 16

regulations and the deference accorded under *Alexander*, the Court is likely to find the USFS did not fail to take a hard look at the cumulative effects of past, present, and reasonably foreseeable future projects on the FFP. *See Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) ("Under NEPA [the court] defer[s] to an agency's determination of the scope of its cumulative impact review").

### 2.    Range of Alternatives

Plaintiffs allege the USFS did not consider a reasonable range of alternatives in deciding on its chosen course of action for the FFP. (Ct. Rec. 15-1 at 13.)   NEPA requires agencies to "rigorously explore and objectively evaluate all reasonable alternatives" to a proposed plan of action that has significant environmental effects.   40 C.F.R. § 1502.14(a).   Such a consideration of alternatives is "the heart" of an EIS.  *City of Carmel-by-the-Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).   However, in deciding whether an action will have significant effect – and thereby, whether to actually produce an EIS – the range of alternatives the USFS must consider is determined by the "nature and scope of the proposed action."  *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992) (quoting *Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).   Thus, NEPA does not require the USFS to "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives."  *Moseley*, 80 F.3d at 1404; *Mumma*, 956 F.2d at 1522.   Nevertheless, "the existence of a viable but unexamined alternative renders" the NEPA procedures inadequate.  *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051,

1057 (9th Cir. 1985). Thus, while the purpose and need for a project is the determining factor in considering the range of alternatives to be examined, if Plaintiffs can demonstrate an alternative better suited to accomplishing this purpose was not considered, the USFS's procedure will be held inadequate. *See id*.

As discussed in the EA, the express purposes and needs of the FFP are to: (1) recover the economic value of a proportion of the dead and dying trees in the Fischer Fire area; (2) improve road-side safety by removing hazardous trees along roadways; and (3) accelerate reforestation of desired tree species in areas where no seed source remains. EA at 1-6; DN at 1. In accordance with these declarations, the USFS examined a variety of alternatives and their ability to meet the FFP's purpose and need. The USFS initially examined 23 different alternatives ranging in degree of activity. EA at 2-4, 2-28. Four of these alternatives were selected for detailed examination through the EA's discussion, including the no-action alternative. *Id*. at 2-4. A modified version of Alternative Two described in the EA was selected as the appropriate course of action after reviewing the EA and public commentary. DN at 3. Modified Alternative Two includes salvage harvest of 2,112 acres of the 10,873 acres of the burned National Forest woodlands.[3] (Ct. Rec. 31-4 ¶ 4.); EA at 2-6. Hazardous roadside trees will be removed to provide safe and adequate road access, and approximately 14.4 miles of currently closed roads and 1.3 miles of new road will be used for the project and

---

[3]At oral argument, defense counsel stated the FFP only encompassed 1,946 acres. The Court recognizes the disparity, but does not find it to be dispositive for any of Plaintiffs' claims.

ORDER ~ 18

closed upon its completion.  EA at 2-6.  Reforestation will occur over approximately 3,486 acres, including areas that will not possess a natural seed source due to the cataclysmic effects of the fire for many decades.  *Id*. at 2-7.  Alternative One suggested no action or salvage logging, Alternative Three proposes no action in the Eagle MLSA, and Alternative Four sought to reduce economic risk by eliminating ponderosa pine dominated units from salvage due to the propensity of the wood to become infested with blue-stain fungus.  *Id*. at 2-4 to 2-11.

Plaintiffs assert the USFS failed to consider a reasonable range of alternatives beyond salvage logging.  (Ct. Rec. 34-1 at 12.)  However, the USFS need not consider alternatives inconsistent with its basic policy objectives.  *Moseley*, 80 F.3d at 1404.  Even so, the USFS considered a no-action alternative as well as an alternative in line with the recommendations of the 1995 *Beschta* report.  This no-action alternative was developed in depth along with the three other salvaging alternatives discussed above.  Further, simply because Plaintiffs disagree with the choice of alternatives by the USFS is not enough to merit injunctive relief, even if there are strong environmental concerns backing the disagreement.  *City of Carmel-by-the-Sea*, 123 F.3d at 1159; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by [NEPA] from deciding that other values outweigh the environmental costs").  As judicial review is only procedural and a court cannot impose its own judgment in substitution for that of the USFS under *Laguna*

1  *Greenbelt*, the Court is unlikely to find the USFS failed to consider a

2  reasonable range of alternatives.  *Laguna Greenbelt*, 42 F.3d at 523.

3      **3.    Snag Removal in the Eagle MLSA**

4      Plaintiffs assert the breadth of authorization of snag removal in

5  the Eagle MLSA by the USFS violates NFMA.  NFMA requires the USFS to

6  "develop, maintain, and, as appropriate, revise land and resource

7  management plans, for units of the National Forest System."  16 U.S.C.

8  § 1604(a).  In addition, NFMA obligates the USFS to "balance competing

9  demands on national forests, including timber harvesting, recreational

10 use, and environmental preservation."  *Lands Council*, 379 F.3d at 742 n.2

11 (quoting 16 U.S.C. § 1607 and citing 16 U.S.C. § 528-531).  Forest

12 planning and management under NFMA occurs in stages: first, the USFS

13 develops the LRMP for the National Forest and then the USFS may assess

14 site-specific projects.  *Neighbors of Cuddy Mountain v. United States*

15 *Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).  Site-specific

16 decisions made by the USFS must be consistent with the broader Forest

17 Plan.  *Id*. 137 F.3d at 1376-1377; 16 U.S.C. 1604(I); 36 C.F.R. § 219.10.

18     The WLRMP is the land use plan governing public lands in the

19 Wenatchee National Forest ("WNF"); whereas, the NFP is the broader Forest

20 Plan for all Bureau of Land Management land within the range of the

21 northern spotted owl.  Since the WNF lies within the range of the

22 northern spotted owl, the WLRMP must be consistent with the requirements

23 of the NFP.

24     The NFP provides a set of standards and guidelines for salvage in

25 MLSA areas "following a stand-replacing event such as those caused by .

26 . . fires."  (Ct. Rec. 31-5 at 7.)  In fact, the NFP specifically notes

1   "the potential for benefit to specifies associated with late-successional

2   forest conditions from salvage is greatest when stand-replacing events

3   are involved." *Id*. at 8.   Thus, snag removal is authorized within the

4   MLSA.   However, the NFP states, after a stand-replacing wildfire, the

5   USFS "should focus on retaining snags that are likely to persist until

6   late-successional forest conditions have developed and a new stand is

7   again producing large snags." (Ct. Rec. 31-5 at 8.)

8        The USFS has demonstrated an effort to retain snags that will

9   persist until late-successional forest conditions would develop.   As

10  noted earlier, the USFS proposes to only salvage injured trees up to 20"

11  in diameter with a 75 percent or higher probability of dying and injured

12  trees larger than 20" in diameter with an 85 percent or higher mortality

13  probability.   DN at 10.   Any trees larger than 36" in diameter –

14  coincidentally, the type of trees most likely to survive until late-

15  successional conditions have developed – would be retained.   *Id*. Further,

16  while the RRSS would initially reduce snag density in the Eagle MLSA, the

17  "planting of 523 acres where there is no immediate seed source within the

18  MLSA would accelerate reforestation and establish late-successional

19  forest decades faster" than taking no action, thereby coinciding with the

20  express purpose of the NFP guidelines – to promote late-successional

21  habitat.   EA at 3-13.   The USFS was also careful to not enter or schedule

22  any salvage activities in current late-successional habitat, including

23  spotted owl allocations.   *Id*.

24       During oral argument, Plaintiffs challenged the USFS's snag

25  retention levels as insufficient under the WLRMP standards and

26  guidelines.   Under the WLRMP, the management goals for dry forest within

the Eagle MLSA requires 7 snags per acre be maintained over time and 14 snags per acres be retained if no green trees exist.  EA at 3-8 to 3-9. Within the mesic forest group, the WLRMP requires 14 snags per acre be maintained over time and 21 snags per acre be retained if no green trees exist. EA at 3-9.  Plaintiffs assert the EA provides in dry forest only 6.1 snags per acre will be maintained over time and 10.3 snags per acre will be retained where no green trees exist.  Further, they claim the EA also states in mesic forest only 13 snags per acre will be maintained over time and 17.2 snags per acre will be retained where there are no green trees.  Under these calculations, the USFS's snag retention would violate the WLRMP.

The Court's understanding of the final calculations expressed in the EA differs from that of Plaintiffs.[4]  In support of their contentions, Plaintiffs cite to Table 3.31 of the EA, which discusses snag density both before and after the Fischer Fire.  EA at 3-91.  The numbers demonstrate the significant increases in snag density resulting from the wildfire.  Additionally, the table discusses snag *recruitment* believed to occur over time in dry and mesic forest regions.  It provides 6.1 snags per acre will potentially be recruited in the dry regions of the MLSA over the short term and 10.3 snags per acre will be recruited over a further delayed time period.  *Id*.  Within the mesic forest, 13 snags per acre and 17.2 snags per acre will also potentially be recruited, respectively.  *Id*.  In contrast, Table 3.33 discusses the snag densities

---

[4]Plaintiffs also cited to a table within the DN during oral argument.  After careful examination of the DN, the Court cannot locate any such table.

ORDER ~ 22

1  expected to exist according to treatment plans by the various
2  alternatives.   EA at 3.95.  Alternative two, the proposal chosen by the
3  USFS, identifies 26.1 snags per acre will be retained in dry forest and
4  25.8 snags per acre in mesic forest.  *Id*.  These numbers correspond to
5  those expressed by Defendant-Intervenor at oral argument.   Thus, the
6  Court finds Table 3.31 did not express snag density retention numbers and
7  holds the USFS complied with WLRMP standards and guidelines.

8      The Court finds the USFS has placed sufficient limitations on its
9  activities within the MLSA in order to balance the competing demands on
10 national forests and has complied with the standards expressed in the
11 WLRMP.  As such, it is likely the Court will hold the USFS's snag removal
12 in the Eagle MLSA does not violate NFMA.

13     **4.   Major Purpose: Economic Recovery**

14     Plaintiffs contend the USFS violated both the NFP and NFMA by
15 identifying the major purpose of salvage activities within the MLSA as
16 economic recovery through salvage logging.   The crux of Plaintiffs'
17 argument stems from the NFP's Final Supplemental Environmental Impact
18 Statement ("FEIS"), which provides "[s]alvage [in Late-Successional
19 Reserves] will not be driven by economic or timber sale program factors."
20 (Ct. Rec. 34-2 at 12.)

21     Throughout both the EA and DN, the USFS explicitly states the major
22 purpose of the FFP is economic recovery.  EA at 1-6, 1-7, 1-8, 1-31, 2-5,
23 2-9, 2-29, 2-31, 2-32, 2-33, 3-15.  Nevertheless, the Court recognizes
24 this to be the major purpose of the entire FFP's salvage logging, of
25 which activity in the Eagle MLSA is only a small part.  The Modified
26 Alternative Two selected by the USFS will salvage log 2,112 acres of land

ORDER ~ 23

in the WNF.  (Ct. Rec. 31-4 ¶ 4.)  Of this land, only 350 acres represent MLSA allocations.  (Ct. Rec. 31-4 ¶ 4.)  Therefore, 1,762 acres of the project occur within Matrix lands, commonly allocated for economic logging.  Since the EA deals with the entire FFP, economic recovery does drive the whole project; however, it may not be the major motivating factor for activity within the Eagle MLSA.

The activity within the Eagle MLSA promotes the development of late-successional habitat.  The EA states reforestation will occur over approximately 3,486 acres of land in the FFP, including areas that do not possess a natural seed source, accelerating regeneration of late-successional habitat by many decades.  EA at 2-7.  This reforestation project collects its necessary funds from the proceeds of the RRSS contracted to Boise.  As such, the reforestation would not be possible without the salvage sale's economic recovery.  Such a project accords with the NFP restrictions within MLSA allocations, which state "[s]alvage guidelines are intended to prevent negative effects on late-successional habitat, while permitting some commercial wood volume removal."  NFP at C-13.  The USFS has committed to salvaging some timber for commercial purposes from the MLSA – salvage will only occur on some trees within 350 acres of the total 1037 acre allocation – in order to promote the growth of late-successional habitat.  EA at 1-4.

Thus, the majority of logging for the FFP will occur in Matrix allocations and any salvage logging in the MLSA is offset by the planned reforestation, which will promote the development of late-successional habitat decades sooner.  Accordingly the Court is unlikely to find the

1  major purpose of the FFP – economic recovery – to conflict with the NFP's

2  MLSA restrictions.

3      **5.  Soil Disturbance Standards**

4      Plaintiffs allege the USFS's detrimental soil treatments fail to

5  live up to the standards outlined in the LRMP, violating NFMA.  Chapter

6  IV of the WLRMP states "the total acreage of all detrimental soil

7  conditions should not exceed 20 percent of the total acreage within the

8  activity area" and "sites degraded by management activities shall be

9  rehabilitated."  WLRMP at IV-97, IV-98.[5]  However, the WLRMP does not

10  specifically address pre-existing soil disturbance for historic entries

11  on a given piece of land.  (Ct. Rec. 31-8 ¶ 6.)  The EA states further

12  direction comes from the Forest Service Manual, Pacific Northwest Region,

13  Supplement 2500.98-1 section 2520.3, which states: "in areas where more

14  than 20 percent detrimental soil conditions exist from prior activities,

15  the cumulative detrimental effects from project implementation and

16  restoration must, at a minimum, not exceed the conditions prior to the

17  planned activity and should move toward a net improvement in soil

18  quality."  EA at 3-16.  This finding has previously been recognized in

19  this district. *Kettle Range Conservation Group v. U.S. Forest Serv.*, 148

20  F. Supp. 2d 1107, 1126 (E.D. Wash. 2001) ("The Regional Standard says

21  that, if a site currently exceeds the standard, it can be treated if the

22  treatment results in a net reduction in detrimental soil conditions").

23      Although the court in *Kettle Range* found the USFS failed to properly

24  meet soil quality standards, the holding was due to the USFS's failure

25  ───────────────────

26

[5]http://www.fs.fed.us/r6/colville/cow/previous-fp/wenatchee/chap_4_a.htm

to actually set foot in the areas it planned to mitigate, and thus, it could not accurately describe the effects the mitigation measures would have. *Id*. at 1126-1127. Such is not the case here as "soil disturbance was mapped by traversing areas within the fire perimeter, and noting the condition class of soils." EA at 3-16. As such, the USFS has scientific evidence to support the EA's mitigation measure conclusions, and therefore, *Kettle Range* can still apply.

The EA's projected course of action "would increase disturbance on approximately 38.8 acres within the project area as a result of skyline yarding . . . [and] 26 acres from landing and road construction." EA at 3-30. Within approximately, 65 acres, 42.6 have little or no evidence of pre-existing soil disturbance. *Id*. As noted earlier, Boise has now committed to conducting the RRSS entirely through helicopter logging techniques. (Ct. Rec. 13-1 ¶ 8.) Thus, the RRSS will not increase disturbance on the 38.8 acres previously accounted for by skyline yarding. The maximum area which could experience detrimental soil conditions is 26 acres, and this number is likely smaller as a portion of this area likely falls into the 42.6 acres with little or no prior disturbance and road construction will likely not create sufficient new disturbances to raise to a serious detrimental level. Moreover, subsoiling mitigation measures – tilling to reduce detrimental compaction – will be used on 52.4 acres of the project area. EA at 3-31; (Ct. Rec. 31-8 ¶ 18.) As a technique, subsoiling reduces compaction and improves soil function by effectively loosening the soil. EA at 2-25, 3-31, O-22; (Ct. Rec. 31-8 ¶¶ 18-19.) Thus, by subtracting the possible maximum of 26 acres to be detrimentally affected from the 52.4 acres to experience

mitigation measures, at least 26.4 acres of areas near or above soil standards would show a net improvement in soil conditions.

Plaintiffs allege the subsoiling techniques only possess a 40 percent chance of actually improving the soil, referencing the past project undertaken by Mr. Karrer. (Ct. Rec. 34-1 at 18.) Yet, Plaintiffs' position references the effects of subsoiling on 10 skid trails used as a reference point for the project and not the 33 transects which were the actual focus of the mitigation techniques. *Id*. All 33 of the transects subsoiled in the project experienced increased penetration depths as compared to untreated sites, demonstrating an apparent 100 percent chance of soil function improvement, allowing for vegetation recovery and increased water penetration. (Ct. Rec. 31-8 ¶ 19.) The Court finds the activities planned in the RRSS area are likely to not exceed the detrimental conditions existing prior to the FFP and will likely create a net improvement in soil quality in accord with the Forest Service Manual and *Kettle Range*. As such, the Court grants the necessary deference to the USFS and is unlikely to find a NFMA violation with respect to WLRMP soil standards.

### 6.  Irreparable Injury and Balance of Hardships

Based on the foregoing, the Court concludes Plaintiffs have not demonstrated a significant likelihood of success on the merits and will require a greater degree of harm to justify equitable relief than if they made a stronger showing on the merits. Plaintiffs claim the RRSS will result in irreparable environmental injury if a preliminary injunction is not invoked. In support of these allegations, Plaintiffs cite to *Neighbors of Cuddy Mountain*, which states "[t]he old growth forests

plaintiffs seek to protect would, if cut, take hundreds of years to reproduce. The forests will be enjoyed not principally by plaintiffs and their members but by many generations of the public." *Id.* at 1382 (quoting *Portland Audobon Soc'y v. Lujan*, 884 F.3d 1233, 1241 (9th Cir. 1989)). Moreover, Plaintiffs submit a declaration by one of their members detailing the aesthetic and recreational losses he will experience if salvage logging occurs, (Ct. Rec. 34-5).

The timber harvests Plaintiffs cite in *Neighbors of Cuddy Mountain* and *Lujan* are distinguishable from the FFP. Neither timber harvest in the these cases were proposed after an uncharacteristically severe burn, which caused high tree mortality and resulted in the removal of "large expanses of dry forest, including nearly all the mature and old growth habitat." EA at 3-103. Within the MLSA, the USFS proposes to only salvage injured trees up to 20" in diameter with a 75 percent or higher probability of dying and injured trees larger than 20" in diameter with an 85 percent or higher mortality probability. DN at 10. All trees greater than 36" in diameter will be retained, regardless of their mortality probability. *Id.* Further, the USFS propose to reforest and provide new seed sources "needed to develop late successional or old-growth habitat in the long-term." EA at 3-133. Thus, the FFP is quite different from the timber harvests Plaintiffs cite, and as such, does not pose a significant threat to old growth habitat, but rather would establish late-successional and old growth habitat decades faster than taking no action. EA at 3-13.

Balanced against Plaintiffs' asserted aesthetic and recreational harms are the financial losses to the government and to Boise if the RRSS

is enjoined.    In making a decision as to whether to grant injunctive relief, courts are to pay "particular regard [to] the public consequences." *Weinberger*, 102 S. Ct. 1798, 1803.    Due to the rapid decay of the dead or dying timber due to the blue-stain fungus and bark beetle infestations, further delay of the RRSS would likely result in a cancellation of the RRSS by Boise.    (Ct. Rec. 31-4 ¶ 10.)    This cancellation would result in a loss of $159,700 of revenue for the government from the sale, as well as losses in road maintenance dollars and brush disposal funds.    *Id.;* (Ct. Rec. 31-1 at 32.)    Boise will lose out on the original $287,000 timber profit and be forced to purchase the volume on the open market to keep the mill running, at a cost of $3,575,000.    (Ct. Rec. 13-1 ¶ 15.)    In addition, Boise operates several mills in the region that will process the harvested trees, which employ over 1,100 people and also contract with at least 800 additional people working in the field providing logs for the mills.    (Ct. Rec. 13-1 ¶ 2.) These employees and families will likely be adversely economically effected if Boise loses out on several million dollars from the injunction.    Enjoinder of the RRSS would also remove the benefits of reforestation to areas without seed sources and improved soil characteristics, which would unnecessarily and unreasonably eliminate actions designed to produce late-successional and old growth habitat much sooner, a significant benefit to this forest.

Considering the evidence and allegations of harm that will result from granting or withholding equitable relief, the interests of the public, and Plaintiffs' showing on the merits, the Court concludes preliminary injunctive relief is not warranted in this case.

ORDER ~ 29

Accordingly, **IT IS HEREBY ORDERED:**

1.    Plaintiffs  Conservation  Northwest  and  Cascadia  Wildlands Project's Motion for Preliminary Injunction, **(Ct. Rec. 3),** is **DENIED.**

2.    The current injunction is continued and will **expire seven days after this Order is entered** to allow the Plaintiffs an opportunity to file an appeal and the Ninth Circuit to react to the appeal if necessary.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this __26th__ day of August, 2005.


                          __S/Edward F. Shea__

                          EDWARD F. SHEA
                    United States District Judge


Q:\Civil\2005\0220.PI.deny.wpd

ORDER ~ 30